**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CIT COMMUNICATIONS FINANCE CORPORATION, f/k/a AT&T Credit Corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 08 C 6458** |
| **v.** | ) | |
| | ) | |
| **WES-TECH AUTOMATION SOLUTIONS, LLC, f/k/a Wes-Tech Automation Systems, LLC; RALLY CAPITAL SERVICES, LLC; and HOWARD B. SAMUELS,** | ) | **JUDGE DAVID H. COAR** |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

On November 10, 2008, Plaintiff CIT Communications Finance Corporation, f/k/a AT&T Credit Corporation ("Plaintiff" or "CIT") brought this action against Defendants Wes-Tech Automation Solutions, LLC, f/k/a Wes-Tech Automation Systems, LLC ("Wes-Tech"), Richard Gilchrist, Rally Capital Services, LLC ("Rally"), and Howard B. Samuels ("Samuels"), alleging nine counts. On December 16, 2008, CIT voluntarily dismissed Gilchrist. On December 2, 2009, the remaining parties proceeded to a bench trial on CIT's claims of conversion against Wes-Tech and Samuels (Counts I and IX respectively), *quantum meruit* against Wes-Tech (Count II), implied contract against Wes-Tech (Count VII), and personal liability for rent against Samuels, as assignee (Count VIII). Based on the trial, and the parties' pre-trial and post-trial submissions, the Court makes the following findings of fact and conclusions of law. To the extent that any findings may be deemed conclusions of law, they shall also be considered conclusions; to the extent that any conclusions may be deemed findings of fact, they shall also be considered findings. *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985).

## FINDINGS OF FACT

**Parties**

1. Plaintiff CIT Communications Finance Corporation is a Delaware corporation.

2. Before Plaintiff became known as CIT Communications Finance Corporation, it went through a series of name changes. Initially known as AT&T Credit Corporation, the company changed its name to NewCourt Communications, and subsequently, to CIT Communications Finance Corporation.

3. CIT is also known as Lucent Technology Product Finance and Avaya Financial Services.

4. CIT is in the business of leasing and financing telephone equipment. This equipment consists primarily of private branch exchange systems, which are fully integrated telephone systems.

5. Wes-Tech, Inc. ("Old Wes-Tech") is an Illinois corporation that did business as Wes-Tech Automation Systems until its involuntary dissolution.

6. Old Wes-Tech's principal place of business was located at 720 Dartmouth Lane; Buffalo Grove, Illinois.

7. Defendant Wes-Tech Automation Solutions, LLC ("New Wes-Tech") is formerly known as Wes-Tech Automation Systems, LLC.

8. New Wes-Tech's principal place of business is located at the premises formerly occupied by Old Wes-Tech—720 Dartmouth Lane; Buffalo Grove, Illinois.

9. Rally Capital Services, LLC is an Illinois limited liability company with its principal place of business located in Chicago, Illinois.

10. Howard B. Samuels is a principal at Rally.

**Telephone System Lease by Old Wes-Tech**

11. CIT leased a Merlin Legend telephone system to Old Wes-Tech pursuant to a lease agreement (the "Lease Agreement") dated February 25, 1998.  (Pl. Ex. 1.)

12. A Merlin Legend system is a private branch exchange system that includes a switch, telephone sets, and various peripherals such as voicemail, a paging system, and a call tracking system.

13. The Lease Agreement provides for an automatically renewable lease term of 60 months and requires Old Wes-Tech to make monthly payments to CIT of $1,459.93 plus applicable taxes.

14. Paragraph 1 of the Lease Agreement provides that CIT may "adjust the Lease Payment by not more than 15% if the Total Cash Price (which is all amounts we have paid in connection with the purchase, delivery and installation of the Equipment, including any upgrade and buyout amounts) differs from the estimated Total Cash Price."  (Pl. Ex. 1 at ¶ 1.)  Pursuant to this provision, the monthly rent was ultimately adjusted to $1,629.68 per month.

15. The Lease Agreement describes the equipment leased as "(1) Merlin Legend w/ intuity and all associated equipment."  (Pl. Ex. 1.)

16. After the parties entered into the initial Lease Agreement, CIT leased additional telephone equipment to Old Wes-Tech pursuant to paragraph 15 of the Lease Agreement.

17. On March 11, 1998, Old Wes-Tech leased additional equipment under a supplemental lease agreement that provides for 57 months at $59.15 per month plus applicable taxes.  (Pl. Ex. 2.) The additional equipment covered by the supplemental lease agreement is described as "(1) merlin legend."  (*Id.*)

18. On June 16, 1998, Old Wes-Tech leased additional equipment under another supplemental lease agreement that provides for 56 months at $138.12 per month plus applicable taxes.  (Pl.

Ex. 3.)  The additional equipment covered by this supplemental lease agreement is described as "(5) Merlin Legend, 408 GS/LS MLX Module."  (*Id.*)

19. The initial February 1998 Lease Agreement governs all additional equipment leased by Old Wes-Tech.  (The phone system and additional equipment together will be referred to hereinafter as the "Equipment.")

20. Under the Lease Agreement, all communication with Old Wes-Tech must be in writing directed to 720 Dartmouth Lane; Buffalo Grove, Illinois.

21. The Lease Agreement provides that it may not be assigned or sold by Old Wes-Tech.  (Pl. Ex. 1.)

22. The Lease Agreement provides that failure to make lease payments or an assignment by Old Wes-Tech constitutes a default.  (Pl. Ex. 1.)

23. The Lease Agreement provides that an assignment for the benefit of creditors constitutes a default.  (Pl. Ex. 1.)

24. Under the Lease Agreement, CIT is entitled to immediate possession of the Equipment in the event of a default.  (Pl. Ex. 1.)

25. At trial, CIT introduced into evidence three UCC financing statements concerning the Equipment it leased to Old Wes-Tech.  (Pl. Ex. 7.)  None of the statements indicate where it was filed.  Only the second statement has a signature.  Only the third statement indicates that it was, in fact, filed and lists a filing date of February 11, 1998.

26. As of November 2004, Old Wes-Tech had defaulted on its payments for the Equipment it leased from CIT.

27. CIT still owns the Equipment that it leased to Old Wes-Tech.

**Transfer of New Wes-Tech's Assets**

28. On December 3, 2004, Old Wes-Tech transferred all of its assets to a trust administered by Samuels pursuant to an agreement entitled "Trust Agreement and Assignment for the Benefit of Creditors" (the "Trust Agreement"). (Pl. Ex. 5.)

29. The assets conveyed by Old Wes-Tech to the trust included the Equipment leased from CIT.

30. Samuels acted as trustee/assignee for the benefit of creditors under the trust.

31. The Trust Agreement provides: "It is understood and agreed that the Trustee/Assignee shall have no personal liability or responsibility for his acts as Trustee/Assignee, but his obligation shall be limited to the performance of the terms and conditions of the [Trust Agreement], in good faith and in the exercise of his best judgment." (Pl. Ex. 5 at 4.)

32. Since 1992, Samuels has served as an assignee for the benefit of creditors over one hundred times.

33. In Wes-Tech's case, Samuels facilitated the assignment for the benefit of creditors by performing the same process he always performs when he acts as an assignee for the benefit of creditors. Once the Trust Agreement was executed, Samuels took control of the premises and accessed all books and records of the company to generate a list of creditors.

34. Samuels performed a lien search to determine whether any third parties had asserted an ownership interest in property on Old Wes-Tech's premises. The search did not reveal any recordings by CIT or any other name CIT uses.

35. After reviewing Old Wes-Tech's financial records, Samuels became aware that CIT (under the name Avaya Financial Services) was one of Old Wes-Tech's creditors.

36. Samuels published two notices stating that the sale of Old Wes-Tech's assets would occur on December 14, 2004 at the offices of Rally Capital Services.

37. Samuels also mailed notice to all known creditors of Old Wes-Tech informing them of the assignment and providing them with claim forms and copies of the published notice relating to the bid sale of Old Wes-Tech's assets.

38. Samuels mailed notice and a claim form to CIT, but the claim form was never returned. Samuels has no personal knowledge that CIT ever received the letter and claim form that he sent.

39. In situations where there will be a distribution to creditors, Samuels attempts to contact creditors who do not return their claim forms. In this case, since there was no distribution to creditors, Samuels did not follow up with CIT.

40. On December 14, 2004, Samuels, as trustee/assignee for the benefit of creditors, caused the trust to sell all of the assets it held to New Wes-Tech.

41. This transfer occurred pursuant to an Asset Purchase Agreement between Samuels, as assignee for the benefit of creditors of Old Wes-Tech, and New Wes-Tech. (Pl. Ex. 4.)

42. Pursuant to the Asset Purchase Agreement, Samuels sold, assigned, transferred, and quitclaimed Old Wes-Tech's right, title, and interest in leases for property, among other assets. (Pl. Ex. 4 at 2-3.)

43. The proceeds received by Samuels as a result of the Asset Purchase Agreement were not sufficient to pay the secured creditor of Old Wes-Tech, Bank of America. Samuels therefore did not make any distributions to unsecured creditors.

44. On March 3, 2005, Samuels sent a letter to Old Wes-Tech's creditors explaining that there were insufficient funds to cover Old Wes-Tech's secured debt and that Samuels was closing his file and terminating the assignment.

45. On Mach 3, 2005, Samuels in fact closed his file and terminated the assignment.

46. On November 29, 2007, Samuels received a letter from CIT's attorney requesting that Samuels provide an accounting of Old Wes-Tech's asset sale and any other information concerning CIT's Equipment. The letter also requested that Samuels "tender . . . all proceeds that you may have acquired or generated from any disposition of CIT's equipment." (Pl. Ex. 21.) The November 29, 2007 letter was the first communication that Samuels received from CIT.

47. By November 29, 2007, Samuels was not in possession of any of CIT's equipment.

48. Samuels did not tender any proceeds in response to CIT's letter because the sale of Old Wes-Tech's assets did not generate any proceeds from any disposition of CIT's equipment.

49. Rally played no role in the assignment for the benefit of creditors.

**Formation of New Wes-Tech**

50. George Garifalis ("Garifalis") is the chief financial officer of New Wes-Tech. In that capacity, he managed New Wes-Tech's acquisition of Old Wes-Tech's assets.

51. In addition to purchasing Old Wes-Tech's assets and operating its business out of Old Wes-Tech's former office, New Wes-Tech hired approximately two-thirds of Old Wes-Tech's former employees, including senior officers.

52. Bob Wescamp, who was the president of Old Wes-Tech, became the president of New Wes-Tech

53. John Reuben ("Reuben"), who was the vice president of finance of Old Wes-Tech, became the vice president of finance of New Wes-Tech.

**The Telephone System Under New Wes-Tech**

54. When New Wes-Tech took over Old Wes-Tech's office at 720 Dartmouth Lane, there was a Merlin Legend telephone system in place. Garifalis testified that he assumed the telephone

system was owned by New Wes-Tech, though he never conducted any investigation to verify that assumption.

55. New Wes-Tech used the telephone system in place for approximately six months.

56. In his capacity as vice president of finance of Old Wes-Tech prior to the assignment for the benefit of creditors, Reuben received CIT's invoices and other communications related to the Equipment leased to Old Wes-Tech.

57. On December 29, 2005, approximately two weeks after the assignment of Old Wes-Tech's assets to New Wes-Tech, Reuben spoke with a CIT representative concerning payment for the Equipment. By that point, Reuben had become the vice president of finance for New Wes-Tech.

58. During Reuben's conversation with CIT, Reuben stated that Old Wes-Tech and its assets were purchased by a new company and that he would "check with them about payment and call [CIT] back." (Pl. Ex. 10.)

59. Reuben also received invoices from CIT after the assignment for the benefit of creditors. (*See* Pl. Ex. 12.)

60. These invoices were stamped "received" and "posted" by New Wes-Tech. Additionally, they were posted as expenses in New Wes-Tech's accounting system.

61. The invoices reflect billing dates that range from December 22, 2004 to May 31, 2005.

62. None of these invoices was ever paid.

**CIT's Attempts to Recover its Equipment**

63. On January 18, 2005, a representative of Old Wes-Tech advised CIT that Old Wes-Tech was in the process of filing for bankruptcy and that CIT needed to contact Rally Capital Services.

The Old Wes-Tech representative stated that she would fax paperwork regarding the assignment for the benefit of creditors. (Pl. Ex. 10.)

64. When CIT's customers declare bankruptcy or permit an assignment for the benefit of creditors, their accounts are transferred to the Investment Recovery Department.

65. Old Wes-Tech's account registered on the Investment Recovery Department's radar in February 2005 and was formally transferred to that department in July 2005.

66. On February 25, 2005, Chris Pheney ("Pheney") of CIT's Investment Recovery Department left a message for Howard Samuels regarding the status of Old Wes-Tech's account.

67. CIT's communication-tracking database does not reflect that Samuels ever returned Pheney's phone call.

68. The database reflects that CIT sent letters to Old Wes-Tech regarding its delinquency on payments to CIT from March to May 2005. (Pl. Ex. 10.) The letters were sent to Old Wes-Tech at 720 Dartmouth Lane, the location then occupied by New Wes-Tech.

69. In May 2006, Pheney spoke with Jeff Samuels of Rally Capital Services, who advised him that the Wes-Tech case had closed over a year ago, there was no distribution to general creditors, and he believed the site had been sold. (Pl. Ex. 10.)

70. CIT never communicated any further with the assignee about the Wes-Tech account.

71. On July 11, 2006, Pheney wrote a letter directed to "Wes-Tech, Inc." (Old Wes-Tech) at 720 Dartmouth Lane. The letter stated, "This is our final effort to bring this matter to an amicable solution. In the event that we are unable to recover our equipment within the next 30 days, we will have no choice but to pursue our legal remedies . . ." (Pl. Ex. 18.)

72. On December 20, 2006, CIT made contact with Don Gross ("Gross"), the vice president of New Wes-Tech and a member of its accounting department. An investigator hired by CIT to

track its equipment visited 720 Dartmouth Lane, where he encountered Gross. Gross stated that Old Wes-Tech had liquidated its assets and gone out of business on December 14, 2004, that New Wes-Tech now occupies the same office, and that the Equipment in question was still at that office. CIT's investigator reported, "A telephone system was viewed at this location and appeared to be in good condition." (Pl. Ex. 19.)

73. On January 12, 2007, Pheney wrote a letter to Gross at New Wes-Tech explaining that CIT held title to the phone system believed to be on New Wes-Tech's premises and requesting that New Wes-Tech either purchase or return the Equipment. (Pl. Ex. 18 at 171.)

74. Pheney sent a similar letter to Gross on May 4, 2007, stating, "I would like to inquire on the present disposition of CIT's equipment. . . . This is our <u>final effort</u> to bring this matter to an amicable solution. In the event that we are unable to resolve this matter within the next 30 days, we will have no choice but to pursue our legal remedies . . ." (Pl. Ex. 18 at 170) (emphasis in original).

75. New Wes-Tech never made any payments to CIT for use and/or possession of the telephone system.

76. New Wes-Tech never returned the telephone system, or any part of it, to CIT.

77. New Wes-Tech caused some or all of CIT's telephone system to be discarded or destroyed.

78. Some of the components of the telephone system have been located at New Wes-Tech's office from December 20, 2006 to the present time.

79. CIT dispatched an investigator to 720 Dartmouth Lane (in connection with the Lake County replevin action discussed below), and in April 2009, the investigator reported that he found only a few components of the Merlin Legend system, such as horns, on the premises. (Pl. Ex. 9.)

**Jeremy Galton's Testimony on the Phone System's Value**

80. Jeremy Galton ("Galton") is currently the vice president of investment recovery at CIT.  In that capacity, Galton handles recovery of money and property.

81. Galton has been in the equipment leasing industry for 11 years.  He testified that this experience has led him to gain an understanding of the fair market value of CIT's telephone systems.

82. Galton testified that the original cost of the Equipment leased to Old Wes-Tech was approximately $115,000.

83. Galton also testified that it would have cost approximately $86,304.94 to replace the entire phone system.  (Pl. Ex. 23.)  That figure reflects the price of a new phone system as well as its installation, software, and licensing.

84. Galton testified that the fair market value of the Equipment in December 2004 was $40,000. (Pl. Ex. 23.)  Galton testified that he arrived at that number because, in his experience, he has been able to sell used equipment at about 40 to 50 percent of its original cost.  Galton testified that $40,000 is the minimum amount CIT would have accepted for the Equipment if it sold the Equipment to a third party or to the lessee at the end of the Lease Agreement term.

85. The first time that Galton offered his opinion that the fair market value of the Equipment equaled $40,000 was in court during this trial.  At his deposition in this action, Galton testified that the fair market value was $86,304.98.  He testified at his deposition that $86,304.98 was the original cost of the Equipment at the time the leases were executed, and that remained the value of the Equipment approximately 10 years later—on February 14, 2008, the date of his deposition.

86. Galton testified that, when looking up the value of the Equipment as of December 2004, he would look at records for sales of fully operational Merlin Legend systems. Although there are various gradients of Merlin Legend systems available, and systems are sold with various optional components, CIT's database does not describe the differences between each fully operational Merlin Legend system sold.

87. CIT's database only lists sales by CIT, not sales of phone systems by other companies.

88. Neither Galton nor his department is responsible for maintaining this database, although they review reports generated from the database.

89. Galton testified that he relied upon CIT's sales database when reaching his opinion on the value of the Merlin Legend system at issue, but the data upon which he relied was not provided to the Court.

90. Galton also testified that, based on his experience, when a new lessee takes over an existing lease, it is usually willing to pay the rental amount set forth in the existing lease.

91. The daily rent for the Equipment under the Lease Agreement between CIT and Old Wes-Tech was $60.89.

**The Lake County Action**

92. CIT recently filed a replevin action against Old Wes-Tech and New Wes-Tech in the Circuit Court of Lake County. CIT filed its second amended complaint in that action on March 12, 2009.

93. In its second amended complaint in the Lake County action, CIT claimed that the resale value of the Equipment at the time that the complaint was filed was $25,890.90. Galton testified that he provided this figure, and the figure reflects his opinion as to the value of the Equipment if it was returned to CIT in its component parts.

94. CIT attached to the Lake County complaint three invoices that correspond to the three lease agreements discussed in this case. Each invoice describes in detail the equipment leased pursuant to the corresponding lease agreement. The purchase price for the equipment listed in the three documents totals $57,912.98. Galton testified that he believes that other, unlisted pieces of equipment, valued at approximately $39,000, explain the difference between the $57,912.98 purchase price and value Galton offers as the Equipment's purchase price in this action.

## CONCLUSIONS OF LAW

I. **Conversion Against New Wes-Tech (Count I)**

a. **Conversion Elements**

In order to prevail on its claim for conversion, a plaintiff must prove that: "(1) he has a right to the property at issue; (2) he has an absolute and unconditional right to the immediate possession of that property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Howard v. Chicago Transit Authority*, No. 1-08-3177, 2010 WL 2305554, at *4 (Ill. App. Ct. June 7, 2010). CIT has succeeded in establishing all four of these elements.

The first two elements of CIT's conversion claim are uncontroversial. CIT owns the Equipment that it leased to Old Wes-Tech, and there is no evidence that CIT ever transferred its ownership interest in the Equipment to any other party. Additionally, CIT obtained "an absolute and unconditional right to the immediate possession" of its Equipment upon Old Wes-Tech's default under the parties' Lease Agreement. Pursuant to the terms of this agreement, Old Wes-Tech defaulted on its obligations to CIT when it failed to make lease payments in November 2004, assigned its assets for the benefit of its creditors, and assigned its interest in the Lease

Agreement.  Any one of these events was sufficient to trigger CIT's right to immediately possess its Equipment.

With respect to the next element of CIT's conversion claim, the Court concludes that New Wes-Tech wrongfully assumed control over CIT's Equipment.  This conclusion flows primarily from the significant overlap between New and Old Wes-Tech's upper management.  Specifically, John Reuben, who served as vice president of finance for both New and Old Wes-Tech, knew that the Equipment belonged to CIT and understood that New Wes-Tech was required to pay CIT rent.  In his capacity as vice president of finance for Old Wes-Tech, Reuben received CIT's invoices and communicated with CIT about the leased Equipment.  Two weeks after the Equipment was assigned to New Wes-Tech, Reuben, now vice president of finance for New Wes-Tech, spoke with CIT concerning payments for the Equipment.  Reuben also received several invoices for the Equipment after New Wes-Tech's acquisition of Old Wes-Tech's assets.  Those invoices were posted as expenses in New Wes-Tech's accounting system, although they were never actually paid.  Because an officer's knowledge is imputed to the corporation, *see A.T. Kearney, Inc. v. INCA Int'l, Inc.*, 477 N.E.2d 1326, 1333 (Ill. App. Ct. 1985), New Wes-Tech "knew" that the telephone system in its office was leased from CIT.  Nevertheless, New Wes-Tech used CIT's Equipment (and in fact still possesses some if its components) without ever paying CIT.  CIT thus satisfies the third element required to establish its conversion claim.

New Wes-Tech argues that CIT cannot satisfy the final element of its conversion claim because CIT failed to demand the return of its property for nearly three years following the last payment it received.  CIT's pursuit of its Equipment upon Old Wes-Tech's default progressed as follows:  At first, CIT stopped receiving payments from Old Wes-Tech around November 2004.  On December 29, 2004, CIT was informed that a new company purchased Old Wes-Tech's

assets, and on January 18, 2005, a representative of Old Wes-Tech advised CIT that there had been an assignment for the benefit of creditors. Until May 2005, CIT continued to send Old Wes-Tech invoices for its Equipment at the office then occupied by New Wes-Tech. On February 25, 2005, Chris Pheney ("Pheney") of CIT's Investment Recovery Department left a message for Howard Samuels regarding the status of Old Wes-Tech's account. Pheney's phone call was apparently never returned. More than a year later, in May 2006, Pheney spoke with Jeff Samuels of Rally Capital Services, who advised him that the Wes-Tech case had closed over a year ago, there was no distribution to general creditors, and he believed the site had been sold. On July 11, 2006, Pheney wrote a letter to Old Wes-Tech at 720 Dartmouth Lane demanding a return of its Equipment to no avail. On December 20, 2006, CIT dispatched an investigator to New Wes-Tech's premises, who learned that Old Wes-Tech had gone out of business and liquidated its assets, New Wes-Tech operated its business in Old Wes-Tech's former office, and CIT's Equipment was still at that office. On both January 12 and May 4, 2007, Pheney sent letters to New Wes-Tech requesting that New Wes-Tech either purchase or return the Equipment believed to be on its premises. On November 29, 2007, CIT's attorney sent a letter to Samuels requesting that he provide information concerning CIT's Equipment and that he tender all proceeds generated from the disposition of this Equipment. According to this timeline, CIT's formal demand that New Wes-Tech return its Equipment occurred by January 12, 2007 at the latest. Although New Wes-Tech faults CIT for failing to make its demand sooner, New Wes-Tech cites no case law to support its argument that CIT's somewhat late demand cannot satisfy the demand requirement for establishing a conversion claim. CIT therefore satisfies all elements required to prevail on its claim for conversion.

### b. *Laches* Defense

New Wes-Tech asserts a *laches* affirmative defense to both CIT's conversion and unjust enrichment claims. *Laches* is an equitable doctrine that bars a plaintiff from asserting a claim when an unreasonable delay in doing so has prejudiced the defendant. *See Madigan v. Yballe*, 920 N.E.2d 1112, 1122 (Ill. App. Ct. 2009). The doctrine of *laches* "is grounded in the equitable notion that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the detriment of the opposing party." *Id.* (quoting *Tully v. State*, 574 N.E.2d 659 (Ill. 1991)) (internal quotation marks omitted). Although traditionally, the *laches* doctrine was applied only in suits arising in equity, over time, Illinois courts have expanded the doctrine's application to actions at law as well. *See Valdovinos v. Tomita*, 914 N.E.2d 221, 226 (Ill. App. Ct. 2009) (noting that *laches* is routinely applied in lawsuits seeking both legal and equitable remedies but that Illinois courts still disagree about whether *laches* is applicable in suits seeking only monetary damages). To prevail on a *laches* defense, "the burden is on the defendant to show a lack of due diligence on the part of the plaintiff in asserting its rights against him and that this delay caused him prejudice." *City of Chicago v. Alessia*, 807 N.E.2d 1150, 1159 (Ill. App. Ct. 2004). With respect to the first part of the required showing, "the defendant must prove not only that a considerable amount of time has passed, but also that the plaintiff had knowledge of the facts giving rise to its claim and chose not to act upon them." *Id.*

New Wes-Tech argues that CIT unreasonably failed to demand a return of its Equipment until three years after New Wes-Tech acquired Old Wes-Tech's assets. According to New Wes-Tech, this delay caused prejudice because New Wes-Tech had already disposed of CIT's Equipment by the time of CIT's demand. Had CIT demanded its Equipment earlier, New Wes-

Tech argues, New Wes-Tech could have determined what property belonged to CIT and returned that property promptly.

The Court is not persuaded by New Wes-Tech's arguments in support of its *laches* defense. At the outset, New Wes-Tech overstates CIT's delay in pursuing its rights. As detailed above, CIT diligently pursued its rights from December 2004, when CIT learned that Old Wes-Tech's assets were sold, until CIT filed the instant lawsuit in November 2008. Throughout this time period, CIT steadily escalated its efforts in pursuit of its rights. CIT sought late payments on its Equipment to no avail, communicated with the assignee and representatives of both Old and New Wes-Tech to determine the Equipment's whereabouts, and dispatched two investigators to search for the Equipment at New Wes-Tech's offices. CIT formally demanded the return of its Equipment for the first time in January 2007 and ultimately filed this lawsuit when all else failed. But for an unexplained break in CIT's efforts from May 2005 to May 2006, CIT diligently pursued its rights with respect to its Equipment. Even if New Wes-Tech could establish a lack of diligence on CIT's part, New Wes-Tech cannot demonstrate that it suffered prejudice as a result. Although the parties have stipulated that New Wes-Tech discarded or destroyed some or all of CIT's Equipment, there is no evidence as to when or why New Wes-Tech disposed of the Equipment. Further, New Wes-Tech offers no evidence linking its disposal of CIT's Equipment with CIT's purported delay in seeking the Equipment's return. From the date of its inception, New Wes-Tech knew that the telephone system on its premises belonged to CIT, and New Wes-Tech cannot blame CIT for its current inability to locate and return CIT's Equipment.

### c. Damages

Although CIT prevails on its conversion claim, CIT is unable to establish its damages with reasonable certainty. Under Illinois law, a plaintiff must establish by a preponderance of the evidence both that it sustained damages and "a reasonable basis for computation of those damages." *Macy's Inc. v. Johnson Controls World Servs., Inc.*, 670 F.Supp.2d 790, 800 (N.D. Ill. 2009) (quoting *Perfection Corp. v. Lochinvar Corp.*, 812 N.E.2d 465, 470-71 (Ill. App. Ct. 2004)) (internal quotation marks omitted). "Damages may not be awarded on the basis of conjecture or speculation." *Telemark Dev. Group v. Mengelt*, 313 F.3d 972, 983 (7th Cir. 2002); *Perfection Corp.*, 812 N.E.2d at 471 (same). Where a plaintiff establishes that it suffered damages but fails to provide a reasonable basis for computation of those damages, the plaintiff may only recover nominal damages. *Macy's Inc.*, 670 F.Supp.2d at 800 (citing *In re Estate of Halas*, 568 N.E.2d 170, 181 (Ill. 1991)). The ordinary measure of damages for conversion of personal property under Illinois law is the fair market value of the property at the time and place of conversion plus legal interest. *Dubey v. Public Storage, Inc.*, 918 N.E.2d 265, 284 (Ill. App. Ct. 2009).

At trial, Jeremy Galton, vice president of investment recovery at CIT, testified as to the fair market value of CIT's Equipment in December 2004. It is difficult to make sense of his testimony and the various figures he claims represent the Equipment's fair market value. During the trial, Galton testified that the cost of the Equipment was approximately $115,000, the cost to replace the Equipment was $86,304.94, and the fair market value of the Equipment in December 2004 was $40,000. Galton made no mention of the $40,000 figure at his deposition. Rather, he testified during his deposition that the fair market value of the Equipment was $86,304.98, which he explained was the original cost of the Equipment at the time that it was leased in February

1998.  Galton testified further that the value of the Equipment ($86,304.98) remained the same

on February 14, 2008, the date of his deposition.  At trial, Galton retreated from the implausible

position that the fair market value of the Equipment remained unchanged over the course of 10

years.  Apparently qualifying his deposition testimony, Galton explained at trial that $86,304.98

would be his starting offer to a new customer looking to purchase the used Equipment.  He then

explained that, when selling used equipment, he generally expects to receive about 40 to 50% of

the equipment's original cost.  Applying this principle, Galton said that he would have accepted

no less than $40,000 for the Equipment at issue here.

   During Galton's cross examination, yet another new figure surfaced.  In a replevin action

that CIT recently filed in the Circuit Court of Lake County, CIT attached to its complaint three

invoices that correspond to the three lease agreements introduced in this case.  Each invoice

details all of the equipment leased pursuant to its corresponding lease agreement.  Collectively,

the invoices indicate that the Equipment's total purchase price was $57,912.98.  When asked to

explain the difference between that figure and the figures offered in this case, Galton testified

that he believes the Lake County complaint failed to account for additional pieces of equipment

involved in the present case.  New Wes-Tech was unable to introduce any evidence to support

this testimony.

   The many numbers floating around the instant damages inquiry represent symptoms of a

larger problem with CIT's case—namely, CIT's failure to offer a reasonable basis for calculating

damages.  As New Wes-Tech points out in its post-trial brief, CIT is unable even to establish a

starting point for its valuation because it never defines the Equipment at issue.  The only

evidence concerning the Equipment leased by CIT derives from the three lease agreements

introduced into evidence, which define the Equipment, respectively, as "(1) Merlin Legend w/

intuity and all associated equipment" (February 1998 lease), "(1) merlin legend" (March 1998 lease), and "(5) Merlin Legend, 408 GS/LS MLX Module" (June 1998 lease). Of course, Galton's starting point for evaluating the Equipment at issue is no less precise than his points of comparison. At trial, Galton testified that he determined the fair market value of the Equipment in December 2004 by reviewing CIT's sales database, which records its sales of fully operational Merlin Legend systems at the same point in time. Although Galton admits that CIT sells various models of Merlin Legend systems, each with multiple optional components, CIT's database does not reflect the distinctions between the fully operational phone systems it sells. Equally fatal to its damages calculation, CIT offers no data to support any of the various figures offered to establish the fair market value of its Equipment. Because CIT cannot offer a reasonable basis for computation of its damages, the Court awards only nominal damages for New Wes-Tech's conversion.

CIT also seeks punitive damages for New Wes-Tech's conversion of its Equipment. Generally, punitive damages for conversion may be awarded where "the defendant acts willfully or with such gross negligence to indicate a wanton disregard of the rights of others." *Bell Leasing Brokerage, LLC v. Roger Auto Serv., Inc.*, 865 N.E.2d 558, 569 (Ill. App. Ct. 2007) (internal citation and quotation marks omitted). The Court finds that CIT has not introduced evidence demonstrating that New Wes-Tech's conversion rises to the level necessary to warrant an award of punitive damages.

## II.     *Quantum Meruit* & Implied Contract Against New Wes-Tech (Counts II & VII)

CIT brings separate *quantum meruit* and implied contract claims against New Wes-Tech. These closely related claims both provide for relief based on the principle of unjust enrichment. Under Illinois law, unjust enrichment occurs when "the defendant has unjustly retained a benefit

to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Eighteen Inv., Inc. v. NationsCredit Fin. Serv. Corp.*, 876 N.E.2d 1096, 1103 (Ill. App. Ct. 2007) (quoting *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672 (Ill. 1989)) (internal quotation marks omitted). The remedy for unjust enrichment assumes the form of a quasi-contract (also known as an "implied contract"). A quasi-contract, which exists independent of any agreement of the parties, is actually not a contract at all, but rather, a "rule of law that requires restitution to the plaintiff of something that came into the defendant's hands but in justice belongs to the plaintiff." *Vill. Of Bloomingdale v. CDG Enter., Inc.*, 752 N.E.2d 1090, 1102 (Ill. 2001) (internal citation and quotation marks omitted). Stated simply, "[l]iability is based on the principle of unjust enrichment and the contract is the *remedy*." *Id.* (emphasis in original).[1]

*Quantum meruit* is a subset of unjust enrichment and concerns situations where valuable services are rendered without compensation. Like claims for unjust enrichment, "[t]he essence of liability is the receipt of a benefit by one party which would be inequitable for that party to retain." *Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.*, 907 F.2d 732, 737 (7th Cir. 1990) (internal citations and quotation marks omitted). A party asserting a *quantum meruit* theory of recovery "must demonstrate the performance of services by the party, the conferral of the benefit of those services on the party from whom recovery is sought, and the unjustness of the latter

---

[1] CIT posits that unjust enrichment does not require wrongdoing on the part of a defendant. In fact, Illinois courts are divided on that score, as courts in this district have repeatedly noted. *See Nat'l Prod/ Workers Union Ins. Trust v. Life Ins. Co. North America*, No. 05-cv-5415, 2010 WL 1292429, at *17 (N.D. Ill. Mar. 29, 2010) ("Other courts in this district have observed that Illinois case law on this point is confusing, as there appear to be conflicting cases.") Some Illinois courts permit recovery for unjust enrichment only where unjust enrichment is tied to "unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence." *Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 928 (Ill. App. Ct. 2009) (internal citation and quotation marks omitted); *see also Alliance Acceptance Co. v. Yale Ins. Agency, Inc.*, 648 N.E.2d 971, 977 (Ill. App. Ct. 1995) (same). Others entertain unjust enrichment claims in the absence of wrongdoing by the defendants. *See, e.g.*, *Eighteen Inv. Co.*, 876 N.E.2d at 1103. This Court need not resolve this conflict, as CIT's unjust enrichment claim relates to New Wes-Tech's conversion of CIT's Equipment.

party's retention of the benefit in the absence of any compensation." *Carlton at the Lake, Inc. v. Barber*, 928 N.E.2d 1266, 1272 (Ill. App. Ct. 2010) (quoting *First Nat'l Bank of Springfield v. Malpractice Research, Inc.*, 688 N.E.2d 1179 (Ill. 1997)) (internal quotation marks omitted).

In this case, CIT's implied contract and *quantum meruit* claims collapse into one other; under both theories of recovery, CIT seeks compensation for New Wes-Tech's use and possession of its Equipment. Rather than considering these overlapping claims separately, the Court will address both together under the heading of "unjust enrichment."[2] CIT has met its burden of establishing that New Wes-Tech was unjustly enriched by its gratuitous use and possession of CIT's Equipment. Undisputedly, New Wes-Tech assumed possession of CIT's Equipment when it acquired Old Wes-Tech's assets, moved into Old Wes-Tech's former office, and found CIT's Equipment there. While very little evidence was presented on the fate of CIT's Equipment, the trial testimony of New Wes-Tech's chief financial officer, George Garifalis, revealed that Wes-Tech used the Equipment for approximately six months. During these six months, New Wes-Tech unjustly retained the benefit of CIT's phone system, which it used without paying CIT. What happened to CIT's Equipment after this six-month period is entirely unclear; the parties have simply stipulated that, at some point, some of CIT's Equipment was discarded, and some of the Equipment's components presently remain at New Wes-Tech's office. CIT argues that New Wes-Tech has been unjustly enriched by its possession of CIT's Equipment from December 2004 through the present day. However, CIT fails to explain how New Wes-Tech was unjustly enriched in any way beyond the six-month period in which it used this Equipment. *See U.S. Gypsum v. Lafarge North America, Inc.*, No. 03 C 6027, 2009 WL 3871824, at *5 (N.D. Ill. Nov. 16, 2009) (rejecting Illinois law unjust enrichment claim where

---

[2] *See Oncology Therapeutics Network Join Venture L.P. v. Olympia Fields Internal Medicine Assoc.*, No. 01C2079, 2003 WL 21087954, at *4 (N.D. Ill. May 13, 2003) (unjust enrichment and *quantum meruit* are "generally synonymous causes of actions.").

plaintiff "has not explained how Defendants are quantifiably enriched as a result of their mere acquisition and possession" of plaintiff's confidential proprietary information).  Nor does CIT cite any applicable case law to support its argument that New Wes-Tech's mere possession of CIT's Equipment constitutes unjust enrichment.

Because CIT has established that New Wes-Tech was unjustly enriched only by its use of CIT's Equipment for six months, CIT's relief is limited to that time period.  Under quasi-contractual theories of recovery, the plaintiff is entitled to restitution in an amount that is "just." *Midcoast Aviation*, 907 F.2d at 745; *Oncology Therpeutics*, 2003 WL 21087954, at *5. That amount is measured by New Wes-Tech's unjust gain at CIT's expense.  *See Saltzman v. Pella Corp.*, 257 F.R.D. 471, 487 (N.D. Ill. 2009).  Here, a "just" recovery amounts to the rental value of CIT's Equipment during the six months New Wes-Tech used this Equipment.  Galton (New Wes-Tech's vice president of investment recovery) offered uncontroverted testimony that, when a new lessee takes over an existing lease, it is usually willing to pay the rental amount set forth in the existing lease.  He also testified that the daily rent for the Equipment under the Lease Agreement between CIT and Old Wes-Tech was $60.89.  The Court accepts CIT's estimate that that is the rental rate New Wes-Tech would have paid for its use of the Equipment beginning in December 2004.  Accordingly, the Court awards CIT six months' rent at a rate of $60.89, which totals $11,142.87, plus interest.[3]

### III.    Claims Against Samuels: Personal Liability for Rent & Conversion (Counts VIII & IX)

For the reasons stated on the record, the Court finds for Samuels on CIT's conversion claim.  With respect to CIT's claim for personal liability for rent against Samuels, CIT offers no

---

[3] The Court determined this amount by multiplying 183 days (the number of days between December 14, 2004 and June 14, 2005) and $60.89/day.

legal basis for this claim. Although CIT discusses an unjust enrichment theory of recovery against Samuels in its post-trial brief, CIT alleges no such claim in its complaint. In any event, the Court finds that Samuels operated entirely within the bounds of his role as assignee and took no actions that warrant a judgment for CIT. The Court therefore finds for Samuels on CIT's claims for conversion and personal liability for rent.

## **CONCLUSION**

On CIT's claims against New Wes-Tech, the Court finds as follows:

The Court finds for CIT on its conversion claim but awards nominal damages in the amount of $1.

The Court finds that New Wes-Tech was unjustly enriched by its use of CIT's Equipment for six months and thus awards CIT restitution in the amount of $11,142.87 plus interest.

Accordingly, on CIT's claims against New Wes-Tech, judgment is entered for CIT in the amount of $11,143.87 plus interest on the restitution award of $11,142.87.

On CIT's claims against Samuels, the Court finds as follows:

The Court finds for Samuels on CIT's claims for conversion and personal liability for rent.

Accordingly, on CIT's claims against Samuels, judgment is entered for Samuels.

Enter:
/s/ David H. Coar

_____
David H. Coar
United States District Judge

**Dated:** August 17, 2010